IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 9, 2015 Session

## STATE OF TENNESSEE v. TIMOTHY DAMON CARTER

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2012-B-1221      Cheryl Blackburn, Judge**

**No. M2014-01532-CCA-R3-CD – Filed March 8, 2016**

A Davidson County jury convicted the Defendant, Timothy Damon Carter, of theft of property valued over $60,000 and of being a felon in possession of a handgun. The trial court sentenced the Defendant as a career offender to a total effective sentence of thirty years in confinement. On appeal, the Defendant contends that: (1) the trial court erred when it determined that he had forfeited his right to counsel; (2) the trial court erred when it denied his motion to suppress evidence seized from his vehicle; (3) the trial court erred when it determined that the State had not committed a *Brady* violation; (4) the evidence is insufficient to sustain his conviction for theft of property valued over $60,000; (5) the trial court erred when it admitted into evidence a business record and an out-of-court statement pursuant to hearsay exceptions; (6) the trial court erred when it declined to bifurcate the felon in possession of a weapon charge; and (7) the trial court erred when it limited the Defendant's ability to call witnesses to testify. After a thorough review of the record and applicable authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J. and ROBERT L. HOLLOWAY, JR., J., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Timothy Damon Carter.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn S. Funk, District Attorney General; Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the theft of a comic book collection from a residence in La Vergne, Tennessee in April 2010. The Defendant was identified as a suspect in the theft when he sold or attempted to sell some of the comic books at area stores. During the investigation, law enforcement officers went to the Defendant's apartment and, upon seeing the stolen comic books in the backseat of a vehicle registered to the Defendant, impounded his vehicle to the police department. After obtaining a search warrant, law enforcement officers searched the Defendant's vehicle and recovered a handgun. The Defendant was later arrested, and a Davidson County grand jury indicted him in November 2010 for theft of stolen property valued less than $60,000 and for being a felon in possession of a weapon. In April 2012, the State filed a superseding indictment for theft of property valued at more than $60,000 and for being a felon in possession of a weapon.

## A. Pre-Trial Motions and Issues

### 1. Representation

At his arraignment on January 15, 2011, the Defendant was declared indigent by the trial court and Jessamine Grice with the District Public Defender's Office was appointed as counsel. Ms. Grice was later removed from the case, and the trial court appointed Graham Prichard as counsel. Mr. Prichard made an oral motion to withdraw, and the trial court granted his motion and appointed Paul Walwyn as counsel. The record contains little documentation regarding the bases for the removal of Ms. Grice and Mr. Prichard. In subsequent orders, however, the trial court noted that the Defendant had "difficulties" with both of these attorneys. On August 19, 2011, Mr. Walwyn filed a motion to be relieved as counsel. The trial court denied Mr. Walwyn's motion after a hearing. On November 18, 2011, Mr. Walwyn filed a second motion to withdraw as counsel, which the trial court took under advisement after a hearing. On January 5, 2012, the trial court issued an order denying Mr. Walwyn's second motion to withdraw as counsel.

The Defendant subsequently filed several motions and requests *pro se*, including a "Motion Requiring Counsel to Withdraw & Appointing Replacement Counsel," in which he requested that Mr. Walwyn be removed from his case. On May 2, 2012, Mr. Walwyn filed a third motion to withdraw as counsel, and on May 16, 2012, the trial court held a hearing on the motion, during which the following statements were made:

> [MR. WALWYN]:    I think basically, as far as communications, I'm not in a position where I can effectively represent [the Defendant]. We've had our differences in the past. We tried to put some of them aside. I

2

think [the Defendant] had asked me the first time to withdraw a while back and we had a hearing. And Your Honor instructed us to try to see if we could work around our differences and instructed [the Defendant] and myself with what we needed to do and try to file things. But in the interim things have deteriorated further. [The Defendant] has been filing these other motions [*pro se*]. I've been trying to comply with some of his requests. And I had been filing some of the things he's been sending me even though they weren't things I thought may or may not be appropriate. And I think that has engendered a lack of trust. And there has been a couple of incidents via phone with my staff, and I would just simply ask Your Honor to relieve me of [the Defendant's] representation at this time without going into further detail.

THE COURT:          Well, this is obviously not the first difficulty we've had with [the Defendant]. I had to relieve Mr. Prichard and then you were on the case. . . .

[THE DEFENDANT]:      It's been to the point that all I was asking for is communication with Mr. Walwyn. Mr. Walwyn has been on my case for like thirteen months now, and he hasn't took [sic] like ten or twenty minutes to come see me to discuss my case. And I've written Mr. Walwyn like several certified letters right here, and he hasn't responded back to any of my letters. I know on January the 5th you asked Mr. Walwyn to correspond with me through a VIE or video conference call, and he did not do so.

THE COURT:          Okay. Now, where are you located, Mr. Carter?

[THE DEFENDANT]:      I'm at Riverbend.

3

THE COURT: Riverbend. Okay. Well, the case is ready to – it was ready for trial. We do now have this superseding indictment. But obviously if it's gotten to the point where – according to this motion here you have been verbally abusive to [Mr. Walwyn's] staff and calling his office. I think the one thing you don't understand – because we have gotten quite a bit of correspondence from you, Mr. Carter – is that you're represented by counsel.

[THE DEFENDANT]: Yes ma'am.

THE COURT: And you can file motions until the sun comes down, and you're not going to be heard, okay, because you're represented by counsel. So you're just [] wasting your paper.

[THE DEFENDANT]: Well, see, I didn't know that Your Honor. That's the reason why it's a lack of communication between me and [Mr. Walwyn]. If I knew that a motion can't be filed pro se on my behalf, the only thing Mr. Walwyn has got to do is correspond with me and let me know, well, Mr. Carter, you're not allowed to file these motions in court. But there's been no communication, Your Honor. All I ask is for a lawyer to communicate with me in my proceedings, and he did not do so. It's been thirteen months.

THE COURT: Okay. Well, I'm going to relieve him. I have an attorney in mind, Mr. Jack Byrd. He won't be here today. He'll be here tomorrow. I'm going to appoint him to your case. You can either cooperate or not, it really doesn't matter.

[THE DEFENDANT]: I cooperate, Your Honor. That's one thing I do is cooperate with my attorney.

4

At the conclusion of the hearing, the trial court granted Mr. Walwyn's motion and appointed Jack Byrd as counsel. At a subsequent hearing on July 27, 2012, Mr. Byrd advised the trial court that he needed to be relieved from the case, based on his conversations with the Defendant. Mr. Byrd told the trial court that it was also the Defendant's wish that Mr. Byrd be relieved from representation. Addressing the Defendant, the trial court admonished him to cooperate with Mr. Byrd, his fourth attorney, and stated that Mr. Byrd would remain on the case.

In a hearing on September 4, 2012, the issue of Mr. Byrd's representation of the Defendant was addressed again. The trial court noted that, during the hearing, the Defendant left the courtroom voluntarily. Mr. Byrd advised the trial court that the Defendant would not cooperate with Mr. Byrd's preparation for trial. Mr. Byrd stated: "[The Defendant] and I have different views. He believes he is a much better legal scholar than I." Mr. Byrd stated that the Defendant did participate in video conferences with Mr. Byrd. The trial court, noting that the Defendant had turned his back to the trial court during his arraignment, acknowledged that the Defendant did not "always want to participate in the process."

On September 11, 2012, Mr. Byrd filed a motion to be relieved as counsel. After a hearing on the motion, the trial court denied the motion and issued an order stating the following:

> The Court held a hearing on the motion on September 19, 2012, where the Court acknowledged that [the] Defendant has been represented by four different counsel during the pendency of his case - Jessamine Grice, Graham Prichard, Paul Walwyn, and currently, Jack Byrd - and has had difficulties with each of his counsel. [The] Defendant even spat at Mr. Byrd after the suppression hearing held on September 4, 2012.

> At the hearing on counsel's motion, the Court inquired if [the] Defendant wished to proceed *pro se* with the assistance of elbow counsel. [The] Defendant's education, however, is limited to 8[th] grade and as demonstrated by his particularly completed Rule 44(a) Written Waiver & Order - Pro Se Representation, [the Defendant] lacks the ability to represent himself at trial.

Mr. Byrd subsequently filed numerous motions in limine on the Defendant's behalf. On October 16, 2012, Mr. Byrd filed a second motion to withdraw as counsel, listing the following facts in support of his motion:

1. That the Defendant is demanding that [Mr. Byrd] withdraw from the case.
2. The Defendant does not have faith in [Mr. Byrd's] representation.

5

3.      That statements and actions by the Defendant have had severe negative effect on the attorney/client relationship.

4.      The Defendant has stated that he has filed a complaint with the Board of Professional Accountability against [Mr. Byrd].

5.      That the Defendant is hiring private counsel.

6.      That the above actions have rendered the attorney/client relationship damaged to the point that it is unrepairable.

On October 26, 2012, the trial court granted Mr. Byrd's motion to withdraw as counsel. The trial court held that the Defendant would represent himself with Mr. Byrd serving as elbow counsel.

The Defendant, *pro se*, subsequently filed several motions and memoranda of law. On January 25, 2013, the Defendant filed a motion for appointment of counsel, requesting that Mr. Byrd be reappointed as counsel. The trial court held a hearing on the motion and issued the following order on April 5, 2013:

> This Order memorializes the Court's April 4, 2013 bench ruling that [the] Defendant has forfeited his right to counsel. In making this determination the Court found that the Defendant has engaged in "extremely serious misconduct" setting forth the reasons on the record and within this written order. Attorney Jack Byrd has been relieved as counsel, however, the above-captioned matter remains set for trial on April 8, 2013.
>
> . . . .
>
> Here, after holding a hearing on April 4, 2013, the Court has found that the Defendant forfeited his right to counsel due to the following grounds:
>
> > 1. Current defense counsel is [the] Defendant's fourth appointed counsel. Prior to Mr. Byrd, Defendant had been represented by Jessamine Grice of the Public Defender's Office, Paul Walwyn, [FN3] and Graham Prichard. He has had difficulties with all of his appointed counsel and continually requested a new attorney. Defendant refused to cooperate with any of his appointed counsel and filed complaints against them with the Consumer Assistance Program Board of Professional Responsibility (CAP).

6

[FN3] The court file reflects Mr. Walwyn made an oral motion to withdraw on March 25, 2011. Thereafter he filed three motions to withdraw as counsel of record, filed on August 19, 2011; November 3, 2011; and May 2, 2012. The Court denied two of the written motions during hearings held on August 25, 2011 and November 18, 2011, respectively. The final request, which was granted on May 16, 2012, stated, "Mr. Carter has become verbally abusive to my staff who are trying to help him." (Motion to Withdraw as Counsel of Record, filed May 2, 2012). [The] Defendant filed a pro se motion on April 16, 2012, styled "Motion Requiring Counsel to Withdraw & Appointing Replacement Counsel" where he details the CAP complaint he filed against Mr. Walwyn.

2. As noted in this Court's Order denying a previous request by Mr. Byrd to be relieved as counsel, [FN5] issued September 25, 2012, [the] Defendant spat on Mr. Byrd after the September 4, 2012 suppression hearing.

[FN5] Since his appointment in mid-May 2012, Mr. Byrd requested to be relieved as counsel through an oral or written motion on at least three occasions: July 12, 2012; September 11, 2012; October 24, 2012.

3. [The] Defendant's hostile reaction to Mr. Byrd has continued and escalated throughout Mr. Byrd's representation. Mr. Byrd has reported previous threats made by [the] Defendant, and at the April 4, 2013 hearing, he testified as to the most recent threats Defendant has made to Mr. Byrd, his family, and his law office staff. [The] Defendant made some of his statements on Mr. Byrd's law office voice message system, and these recorded threats were admitted as an exhibit to the April 4th hearing (Ex. 1). Among other violent statements, [the] Defendant threatened to "slash" Mr. Byrd in court should he continue as counsel on the case.

7

4. During multiple court hearings, [the] Defendant has left the courtroom in the midst of the proceeding, stomping and/or yelling obscenities as he did so. For instance, he refused to participate in his suppression hearing held on September 4, 2012.

5. Additionally, [the] Defendant has refused to come into court for hearings. For example, during his video arraignment, [the] Defendant kept his back to the camera so the Court could not see his face. And, most recently on April 4, 2013, [the] Defendant refused to come to court, physically threatening officers, resulting in [the] Defendant being pepper sprayed in order to subdue him.

6. [The] Defendant has engaged in delay tactics by continually requesting to represent himself and then asserting his right to counsel. [FN7] In fact, on Friday, January 25, 2013, the Friday before [the Defendant's] previously set trial date, [the] Defendant filed a "Motion for Appointment of Counsel", where he requested the Court re-appoint Jack Byrd as counsel for trial because he no longer wanted to proceed pro se. After holding a brief hearing, the Court granted [the] Defendant's request; however, after the hearing [the] Defendant was verbally abusive then left the courtroom before the hearing officially concluded.

> [FN7] For example, [the] Defendant requested to proceed *pro se* on September 25, 2012, and he partially completed a Rule 44(a) "Written Waiver & Order – Pro Se Representation", which was denied by this Court. After subsequent requests, on October 16, 2012, the Court granted [the] Defendant's motion to proceed *pro se* and appointed elbow counsel. At [the] Defendant's request, the Court issued an order on January 4, 2013, directing TDOC to give [the] Defendant adequate computer access to prepare for his case. Shortly thereafter, however, [the] Defendant filed a *pro se* "Motion for Appointment of Counsel", requesting he be appointed counsel, which was

8

heard on January 25, 2013. This motion was followed by a *pro se* "Motion of Permanent Injunctive Relief in the Trial Court Judge The Honorable Cheryl Blackburn", filed on February 22, 2013, where he cited the Tennessee and Federal Rules of Civil Procedure and alleged this Court acted in concert with others to deprive him of his constitutional right to counsel.

Accordingly, [the] Defendant has engaged in "extremely serious misconduct" justifying his forfeiture of counsel. *Holmes*, 302 S.W.3d at 848.

The trial court held that the Defendant would proceed *pro se*. On April 5, 2013, the trial court appointed Charles Walker as standby counsel and stated that the Defendant's trial would commence on April 8, 2013. The trial court stated that "[s]hould [the] Defendant refuse to participate in his trial or engage in conduct necessitating his removal from the courtroom, standby counsel shall represent the Defendant while he is tried in absentia. [The] Defendant will not frustrate the orderly trial process by engaging in any further 'extremely serious misconduct.'" During trial, representing himself, the Defendant repeatedly requested to be represented by counsel and told the trial court that he could not represent himself. The trial court responded that it would adhere to its ruling that the Defendant had forfeited the right to counsel based on his actions. The Defendant refused to enter the courtroom during jury selection but watched the proceedings from a holding booth. The Defendant made his challenges to the selected jurors from the holding booth while Mr. Walker conducted the proceedings on his behalf. The Defendant did participate in the trial, and questioned and cross-examined witnesses himself.

## 2. Suppression

### a. First Motion to Suppress

During the duration of his representation by a series of attorneys, the Defendant filed several motions to suppress and or motions requesting a rehearing of the motion to suppress. The first of these was filed by the Defendant's third attorney, Mr. Walwyn, and it was filed August 5, 2011. The motion requested the suppression of evidence resulting from the search of the Defendant's vehicle. In the motion, the Defendant contended that the police towing of his vehicle to an impound lot was an improper warrantless seizure because law enforcement's presence on his property where the vehicle was parked was unlawful. The Defendant contended that the subsequent issuance of a search warrant for the vehicle was unlawful in violation of Tennessee Rule of Criminal Procedure 41. On September 14, 2011, the trial

court held a hearing on the motion during which the following evidence was presented: Detective John Eubank testified that he was employed by the La Vergne Police Department and investigated a home burglary that occurred on April 5, 2010, resulting in the theft of a comic book collection. Detective Eubank testified that his investigation of the theft led him to the Defendant's residence in Davidson County. He described the Defendant's residence as a condominium or town home. Detective Eubank testified that he went to the Defendant's residence in the early afternoon of April 19, 2010, and observed the Defendant's vehicle parked in a parking spot located in a group of parking spots next to the dumpster that served the condominium building. Photos of the parking lot and the Defendant's parked vehicle were identified by the detective. Detective Eubank stated that it appeared that the Defendant's vehicle was parked in a spot not assigned to any particular condominium unit but possibly assigned to visitors at the complex.

Detective Eubank approached the vehicle and looked inside through the back window. He did not see the Defendant nearby. Detective Eubank testified that, "in plain view," on the backseat of the Defendant's vehicle, Detective Eubank observed comic books matching the victim's description of the stolen comic books, in that they had a black "S" written in sharpie pen on the comic books. At that point, Detective Eubank made the decision to obtain a search warrant for the vehicle. He spoke with his supervisor, and they concluded that, in order to investigate the home burglary, the vehicle needed to be secured while the search warrant was being prepared. Detective Eubank testified that, after he made the decision to tow the Defendant's vehicle, Detective Eubank knocked on the Defendant's condominium door to try and interview the Defendant. He clarified that he did not open the door to the Defendant's vehicle when he looked inside the vehicle through the window.

On cross-examination, Detective Eubank stated that he had arrived at the Defendant's residence based on information he had received from a citizen, not a police officer. Detective Eubank testified that he had been conducting surveillance on the Defendant's residence for several days. He agreed that the Defendant lived in a gated community, but he recalled that the gates remained open to the public during daylight hours and were closed at night.

Detective Eubank testified that what he saw through the window in the backseat of the Defendant's vehicle was "absolutely to the T" the stolen items described by the victim. Detective Eubank stated that he called his supervisor to discuss searching or seizing the vehicle. Detective Eubank stated that neither the vehicle's engine nor its tailpipe was warm. Detective Eubank eventually called a tow truck to tow the Defendant's vehicle. The Defendant's vehicle was towed to the impound lot, and Detective Eubank sought a search warrant for the vehicle. After towing the vehicle, Detective Eubank left his business card in the door of the Defendant's condominium with a note advising that the Defendant's vehicle

had been seized and that more information about the seizure could be obtained from the La Vergne Police Department. On April 21, 2010, Detective Eubank obtained a search warrant from Rutherford County General Sessions Court.

Detective Eubank testified that he did not see any signs that the vehicle had been recently used when he decided to tow it. He testified that the parking lot, in his opinion, was "open to the public" and that the vehicle appeared to be parked in a "visitor's" parking spot and not a "homeowner's." He denied seeing "no trespass" signs or similar signage on the entrance to the parking lot. Detective Eubank recalled that, while he was waiting for the tow truck to arrive, he called the victim to confirm that the items in the vehicle belonged to the victim. The victim again described the stolen comic books, detailing that they were marked with a black "S," consistent with those inside the vehicle. Detective Eubank testified that, after the vehicle had been towed, the victim identified the items in the vehicle at the impound lot.

The trial court questioned Detective Eubank about the condominium complex where the Defendant's vehicle was located. He testified that it was "common practice" for apartment and condominium complexes to leave the gates open during the day and to shut them at night for security purposes. Detective Eubank stated that he had been to this condominium complex several times and recalled that the gates were open during those visits.

The Defendant testified that he had been living in the condominium complex for two years and that the gates were always closed. He testified that a security code was necessary to gain entry to the complex. He agreed that he had seen vehicles enter the complex without entering a security code by following another vehicle in through the gates. He stated that there were signs on the gate prohibiting trespass and indicating that the complex was private property.

On cross-examination, the Defendant agreed that the complex had two entrances. At one entrance, the gates stayed closed at all times. He agreed that at the second entrance, the gates were open during the day to allow the mail truck, yard crews, and trash crews to enter the complex.

The State read into the record the Defendant's history of criminal convictions involving dishonesty: theft of property valued over $10,000, aggravated assault, felon in possession of a weapon, two convictions for aggravated robbery, three convictions for aggravated burglary, and burglary.

11

The trial court questioned the Defendant about the condominium complex. The Defendant testified that the parking spaces in the complex were open to any vehicle and that there were not assigned spots. He agreed that there was not a fence around the parking lot or his building.

At the conclusion of the hearing, the trial court took the motion under advisement. On November 30, 2011, the trial court issued an order denying the motion to suppress. In its order, the trial court noted that counsel for the Defendant had raised, during his closing argument, this issue of Detective Eubank's jurisdiction, as he was a Rutherford County police officer and the vehicle was seized in Davidson County. The trial court pointed out that this issue was not raised in the motion to suppress nor was Detective Eubank questioned about it during the hearing, however, the trial court held in its order that it was not a constitutional violation for Detective Eubank to leave his jurisdiction and enter Davidson County to investigate a crime.

The trial court then stated that it was considering: (1) whether Detective Eubank was lawfully inside the gated condominium complex when he observed the comic books in the backseat of the Defendant's vehicle; and (2) whether it was appropriate for Detective Eubank to impound the Defendant's vehicle while a search warrant was being sought. The trial court concluded that the Defendant had "no expectation of privacy in the communal parking lot" outside his condominium building. The trial court therefore found that "Detective Eubank did not require a warrant to enter the open, communal parking lot area," which the trial court stated was "akin to a private driveway in front of a residence which has been found not to constitute protected curtilage when it abuts a public sidewalk." The trial court found that it was lawful for Detective Eubank to tow and impound the vehicle without first obtaining a search warrant, and it denied the Defendant's motion to suppress.

### b. Motion to Rehear

In August 2012, while being represented by his fourth attorney, Mr. Byrd, the Defendant filed a motion to rehear the suppression issue. In the motion, the Defendant argued that Detective Eubank did not have the "jurisdictional authority" to leave his home jurisdiction of Rutherford County and enter Davidson County to seize the Defendant's vehicle, and thus, the evidence seized from his vehicle should be suppressed. The trial court held a hearing on the sole legal issue of Detective Eubank's jurisdictional authority. Following the hearing, the trial court issued an order stating:

> After reviewing the case law, the Court finds that the issue presented by [the] Defendant is an issue of first impression in Tennessee. There is case law in Tennessee concerning when an officer continues a pursuit across jurisdictional

12

lines and case law regarding an arrest made outside of jurisdictional lines. This Court, however, was unable to find case law on point with the facts in [the] Defendant's case; that is, circumstances where out of county officers cross jurisdictional lines to seize a vehicle that is stationary in another county to then take back across county lines to execute [a] search warrant. This Court, however, has looked to case law from Sixth Circuit federal and state courts for guidance. Case law from sister jurisdictions of Ohio and Michigan have differentiated between constitutional violations requiring suppression versus statutory violations. Having reviewed this case law, the Court finds the same reasoning applies here and is harmonious with the ruling in the Tennessee roadblock case State v. Hicks, that concluded "suppression of evidence is not required if the statutory violation does not actually infringe upon a specific constitutional protection or guarantee." 55 S.W.3d 515, 523 (2001).

> For example, the Sixth Circuit held in Leis that a police department's violation of Ohio State law prohibiting officers to execute search warrants outside of their jurisdiction was a technical violation that did not render the search and seizure unreasonable in constitutional terms for any of the multiple cases the Sixth Circuit was considering in its decision. Steven Guest et al v. Simon Leis, et. al, 255 F.3d 325, 334 (citing State v. Klemm, 536 N.E. 14, 16 (Oh. Ct. App. 1987; United States v. Green, 178 F.3d 1099, 1106 (10th Cir. 1999). Although it was argued that the police were not entitled to immunity because their lack of jurisdiction rendered them as private citizens who are not permitted to conduct searches, the Sixth Circuit disagreed on the basis no Fourth Amendment constitutional violation occurred. Id. at 337.

> The Supreme Court of Ohio has held that the exclusionary rule does not require suppression of evidence gathered during a warrantless arrest simply because the arrest was made outside of the officer's jurisdiction, concluding that the exclusionary rule applied only to those cases involving evidence obtained in violation of the United States Constitution, not to cases involving evidence obtained by violative acts of state statutes only. Kettering v. Hollen, 416 N.E.2d 598 (Oh. Ct. App. 1980); see also State v. McCoy, No. 05-CA-29, 2006 WL

13

39100, at *11 (Oh. Ct. App. Jan. 5, 2006) (relying on Kettering analysis).

An even more recent case from the Supreme Court of Ohio, State v. Jones, 902 N.E.2d 464, 467 (Oh. 2009) differentiated between statutory versus constitutional violations. Although that case involved a traffic stop outside of an officer's territorial jurisdiction, the case relies on the United States Supreme Court decision Virginia v. Moore, 128 U.S. 164, 128 S. Ct. 1598 (2008), where the United States Supreme Court "acknowledged that although states could legislate a higher standard on searches and seizures, those laws do not alter the requirements of Fourth Amendment." Jones, 902 N.E.2d at 467. That is, the Ohio Supreme Court interpreted the ruling in Moore as "remov[ing] any room for finding that a state status, such as R.C. 2935.03 [the Ohio state statute at issue in the Jones case regarding the territorial authority of the officer who made the arrest outside of his jurisdiction], in and of itself, could give rise to a Fourth Amendment violation and result in suppression of the evidence." Jones, 902 N.E.2d at 467.

In the unpublished Michigan case of People v. Zachary, out of county officers obtained a valid search warrant and executed it on a residence outside of their jurisdiction. People v. Thomas Ray Zachary, No. 292619, 2010 WL 3718830 (Mich. Ct. App., Sept. 23, 2010). The Michigan appellate court found that the purpose of the local statute limiting jurisdiction "is to protect the rights and autonomy of local governments, not the rights of criminal defendants." Id. at *2 (citations omitted). As such, the Court held that a statutory violation of jurisdiction did not require application of the exclusionary rule. Id. at *4.

Although, here, the Lavergne police department exceeded their jurisdictional parameters under T.C.A. § 6-54-301, the violation is statutory in nature, not constitutional. As such, the exclusionary rule does not apply. Since there was no violation of [the] Defendant's constitutional rights under the Fourth Amendment of the U.S. Constitution or Article 1, § 7 of the Tennessee Constitution, the Court DENIES [the] Defendant's suppression motion as to jurisdiction and relies upon its previous ruling issued in its November 30, 2011 Order.

14

(footnotes omitted).

## B. Trial

The case then proceeded to trial in two phases, the first phase on the theft charge and the second phase on the felon in possession of a weapon charge. On the morning of trial, the trial court questioned the Defendant about several witnesses he had listed as testifying, Christine Keeves, Sergeant Charles Rutzky, and Lieutenant Gordon Howey. The trial court then questioned each of the witnesses about their involvement with or knowledge of the Defendant's case.

Sergeant Rutzky testified that he worked for the Metropolitan Nashville Police Department and was not involved in this case. He stated that he had nothing to do with the comic books, the seizure of the Defendant's vehicle, or any further criminal investigation. He stated that he had no idea why he had been subpoenaed. Sergeant Rutzky testified that no one from the La Vergne Police Department had contacted him about the Defendant's case. The trial court found that Sergeant Rutzky had no knowledge of the case and no involvement with the investigation and excused him from his subpoena.

Lieutenant Howey testified that he worked for the Metropolitan Nashville Police Department and did not know anything about this case. He testified that he had nothing to do with the recovery of the comic books or the investigation of the burglary in La Vergne. He stated that he did not know why he was subpoenaed. The trial court found that Lieutenant Howey knew nothing about the case and excused him from his subpoena.

Christine Keeves testified that she worked for the La Vergne Police Department in the evidence division. She stated that she photographed the Defendant's vehicle when it was seized but had nothing to do with the impoundment of the vehicle or the chain of custody. The trial court excused her from her subpoena.

The parties then presented the following evidence: Dr. Walter Clark, the victim in this case, testified that, in April 2010, he worked as a veterinarian and lived in La Vergne, Tennessee, located in Rutherford County. He testified that he was the victim of a burglary of his home on April 5, 2010. He left his home for work at around 6:00 a.m. that day and returned at 8:00 p.m. When he returned home, he noticed the lights were on inside his house, which he said was unusual. He entered his garage and saw that his back door had been kicked in, so he called the police. Stolen from his home were a flat screen television, power tools, video game machines, and collectible comic books. The power tools had been kept in

15

the garage, the television in the kitchen, the video game machines in the bonus room, and the comic books in the home office.

Dr. Clark testified that he had collected comic books for thirty to thirty-five years, focusing on comic books from the "golden age," the 1930's and 1940's. Dr. Clark said that he bought comic books online and traveled to auction houses around the country, spending an average of $5,000 per month. He stated that he rarely sold comic books. Dr. Clark described himself as a comic book "collector" and stated that his collection had been ranked 74th in the country by an online registry. Dr. Clark stated that the portion of his comic book collection stored in his spare bedroom was not stolen during the burglary. He testified that his more valuable comic books were stored in a safe at his veterinary office.

Dr. Clark testified that some of the stolen comic books were wrapped individually in a plastic bag with a cardboard support. They were stored in a specialized cardboard box or metal container specifically designed for comic book storage. Dr. Clark estimated that about 1,000 comic books were stolen during the burglary. The day after the burglary, Dr. Clark called area comic book shops in Davidson, Rutherford, and Williamson counties to alert them of the theft. Dr. Clark spoke with "Adam" at The Great Escape in Nashville, which he described as a "collectibles store" selling vintage comic books. Dr. Clark described the stolen comic books and the container they were in and "Adam" confirmed "specifically that those items were presented to him for sale" on the day of the burglary. Dr. Clark called The Great Escape in Madison and provided descriptions of the stolen comic books to a store employee. About a week later, Dr. Clark received a call from the Madison store that "some gentlemen were there [at the store] with some of the comics [Dr. Clark] had described" and were attempting to sell the comic books. Dr. Clark immediately drove to the Madison store but the persons had already left, and the store had not purchased any of the comic books. He spoke with Jason Monk, assistant manager of The Great Escape in Madison, and "four of the books that [Mr. Monk] described to [Dr. Clark] matched exactly with the books in the metal container" stolen from Dr. Clark's residence.

Dr. Clark testified that The Great Escape did purchase his stolen comic books on other occasions, and Dr. Clark identified those comic books as ones stolen from his residence. One comic book had his mother's name on it, which helped him identify that the batch of comic books belonged to him. He also identified the containers. Dr. Clark eventually bought back the stolen comic books from The Great Escape.

Dr. Clark testified that he went to the impound lot at the La Vergne Police Department and identified, through the car window, some of the stolen comic books in the backseat of the Defendant's vehicle. Through the window, it was "apparent" to Dr. Clark that the comic books were his because of their markings. Eventually, Dr. Clark examined the comic books

found in the vehicle and confirmed that they were his. Dr. Clark recovered other comic books by contacting or being contacted by other collectors or dealers throughout the nation who found his name on receipts or other packaging. Dr. Clark repurchased the comic books, in one instance paying a collector in Georgia $4,000. He also made contact with a dealer in New York City at Metropolis Collectibles Inc. ("Metropolis"), which Dr. Clark testified was the world's largest comic book dealer. He paid Metropolis $5,000 for the repurchase of his stolen comic books. At this point, the State sought to introduce as a business record a financial statement from Metropolis detailing Dr. Clark's purchase. An affidavit given by Tamara Cain, an accountant at Metropolis, was read for the jury, stating that the financial statement was a business record kept in the ordinary course of business.

Dr. Clark testified that the comic books he repurchased from Metropolis were generally undamaged, however, two comic books had sustained some damage, and Dr. Clark sent those to a conservator to be restored. Dr. Clark stated that he did not recover his stolen comic books from any other collectors or dealers, other than The Great Escape, the Defendant's vehicle, Metropolis, and the Georgia collector. He stated that some of the stolen comic books remained missing.

Dr. Clark testified that he had prepared lists of the comic books recovered from New York, Georgia, and the Defendant's vehicle, as well as the comic books not recovered, and provided a value for each comic book. The lists were entered into the record as evidence. Dr. Clark stated that he was familiar with the general market for comic books because of his involvement with monthly auctions. Using his knowledge and pricing guides he was able to ascertain a fair market value for the comic books. Specifically addressing one comic book valued at $17,000, Dr. Clark testified that it was from the 1950's and relatively rare because of its availability, subject matter, and condition. Dr. Clark testified that the cumulative value of the comic books recovered from New York City was $56,400, from Georgia, $7,365, and from the Defendant's vehicle, $2,765. The cumulative value of the comic books not recovered was $15,500. Dr. Clark testified that he did not prepare a list of the comic books recovered from The Great Escape, but relied on the cumulative value determined by the staff at The Great Escape, which was $1,100.

Dr. Clark testified that he visited The Great Escape stores several times to identify his comic books or meet with employees. During one visit, an employee, Jason Monk, gave him the license tag number from the vehicle driven by the persons attempting to sell the stolen comic books. Dr. Clark gave the tag number, 220XPV, to the La Vergne Police Department.

On cross-examination, Dr. Clark agreed that no fingerprints were found at his home to identify the perpetrator.

Adam Collins testified that he worked at The Great Escape in Nashville for twelve years. Dr. Clark had contacted him looking for some specific comic books in a metal container, and Mr. Collins recalled that, the day before Dr. Clark's call, two men came into the store trying to sell a metal case of some "very expensive" comic books. Mr. Collins did not make an offer on them because of the value of the comic books. Mr. Collins immediately recognized their value because of their rarity. Mr. Collins identified the Defendant in the courtroom as one of the men who brought the comic books into the store.

On cross-examination, Mr. Collins agreed that he did not call the police when the Defendant came into the store. He also agreed that there was no video surveillance of the men inside the store. Mr. Collins testified that he asked the Defendant for the name of the person selling the comic books, and he gave the name, "Timothy Carter."

Doug Mabry testified that he was the manager of The Great Escape in Madison and that Dr. Clark had contacted him about the stolen comic books. Dr. Clark left his phone number with Mr. Mabry and descriptions of the stolen comic books. Thereafter, "several African American males" came into the store with "some very rare valuable comic books, the type that there are generally less than a couple hundred in existence." Mr. Mabry recognized the comic books "immediately." Mr. Mabry informed the sellers that he needed permission from his manager to buy the expensive comic books, and, in an attempt to delay the sellers from leaving the store, he went into the back office as if he was speaking to the manager and called the police and Dr. Clark. Mr. Mabry could not recall if the Defendant was one of the sellers but he did recall that the men left before the police and Dr. Clark arrived. Another employee wrote down the license tag number of the vehicle driven by the sellers.

Jason Monk testified that he also worked at The Great Escape in Madison, and he said that he bought comic books belonging to Dr. Clark. He testified that he knew they were stolen but bought them knowing that Dr. Clark planned to reimburse the store. Mr. Monk identified his own handwriting on the "pay-out voucher" used to document the seller's information. He identified the field where he had written down the seller's identification, which he took from the seller's driver's license. The name on the form was "Timothy Carter." When asked if the Defendant was the person who sold him the comic books, Mr. Monk replied, "I believe it was."

On cross-examination, Mr. Monk testified that there was no surveillance inside the store.

The State submitted as evidence a letter from the Tennessee Department of Revenue, Taxpayer, and Vehicle Services Division identifying the license tag number 220XPV as being registered to the Defendant.

18

Michael Carpenter testified that he was currently serving a sentence for simple possession of marijuana and that, in April 2010, he was serving a probation sentence for possession of cocaine with the intent to sell.

In April 2010, Mr. Carpenter and the Defendant had contact concerning some comic books. He testified that he and the Defendant were approached by a man on the street who said he had some "merchandise" to sell in exchange for cocaine and money. Mr. Carpenter stated that the comic books came from the man on the street "who wanted crack" in exchange for the comic books. Mr. Carpenter testified that he told Detective Eubank, during an interview at Mr. Carpenter's residence, that he and the Defendant "got the comic books from a guy that wanted crack." He agreed that he sold some comic books to The Great Escape. Mr. Carpenter denied telling Detective Eubank, during the same interview at Mr. Carpenter's house, that the Defendant had gotten the comic books came from a house. At this point, a jury-out hearing was held on Mr. Carpenter's prior statement to Detective Eubank.

During the jury-out hearing, Detective Eubank testified that in April 2010, he and Mr. Carpenter's probation officer went to Mr. Carpenter's residence. They found a small amount of marijuana there. After leaving Mr. Carpenter's residence, Detective Eubank and Mr. Carpenter had a phone conversation that was recorded. Detective Eubank testified that Mr. Carpenter had never told him that the Defendant had bought the comic books from a man selling drugs on the street. Detective Eubank testified that Mr. Carpenter told the detective that the Defendant had gotten the comic books from "hitting a lick," which Detective Eubank explained was the "street terms . . . meaning he got them in a burglary." A segment of the recording was played aloud, and Detective Eubank identified himself, the probation officer, and Mr. Carpenter speaking. Detective Eubank testified that during the recorded conversation, Mr. Carpenter said that the Defendant got the comic books "during a lick" and that the Defendant got them out of a house, "referring to the comic books were taken out of a house so that [the Defendant] was responsible for taking those comic books."

Based on this evidence, the trial court held that Mr. Carpenter's statement to Detective Eubank was admissible as evidence pursuant to Tennessee Rule of Evidence 613 as a prior inconsistent statement. The trial court noted that "Mr. Carpenter is present to testify and can be cross-examined about this statement." The trial court determined that the recording was trustworthy and that the limited segment could be played for the jury.

When the jury returned to the courtroom, Mr. Carpenter resumed his testimony, stating that, when Detective Eubank and the probation officer came to talk to him, he did tell them about the comic books and about the Defendant's involvement. Mr. Carpenter stated that his memory of his statement was clarified by the audio recording played during the jury-out

hearing. Mr. Carpenter identified himself on the recording. He testified that the Defendant did not tell him from where he obtained the comic books, just that "[the Defendant] said he hit a lick," meaning that the Defendant got them illegally.

Detective John Eubank testified that he investigated the burglary at Dr. Clark's residence. The State showed Detective Eubank two receipts from The Great Escape, and he identified the seller's names on the receipts as "Timothy Carter" and "Michael Carpenter." Detective Eubank testified that the victim gave him the license tag number from the seller's car, and he was able to determine that the tag was registered to the Defendant.

Detective Eubank testified that he met Mr. Carpenter with his probation officer to talk about the stolen comic books. He asked Mr. Carpenter about where he got the comic books, and he told Detective Eubank that he got them "hitting a lick." Mr. Carpenter also stated that he got them "out of some guy's house."

Detective Eubank testified that he went to the Defendant's residence in Antioch, Davidson County, Tennessee, about ten minutes' drive from Dr. Clark's house. The address of the Defendant's residence was listed on one of the receipts from The Great Escape. There he saw a vehicle with a box of comic books in the backseat, viewable through the car window. Detective Eubank called Dr. Clark while in the parking lot and described the comic books to him to be sure they were Dr. Clark's stolen comic books. Dr. Clark confirmed the marking on the comic books, a black "S." He subsequently had the vehicle towed to the La Vergne Police Department and obtained a search warrant for the vehicle. Inside the vehicle, in addition to the comic books, Detective Eubank found a vehicle registration and cell phone bill, both listing the Defendant's name. Detective Eubank also found a gun in the engine compartment of the vehicle. The gun was shown to the jury and entered into the record as evidence.

On cross-examination, Detective Eubank agreed that he did not get a warrant to enter the condominium complex where the Defendant lived, but he stated that the gates were open to the public. He agreed that he did not contact the Davidson County police, the county in which he seized the Defendant's vehicle. He also agreed that his jurisdiction was Rutherford County, not Davidson County. Detective Eubank testified that listed on the applications for the search warrant was the information that the vehicle was to be seized from another county. Detective Eubank agreed that no fingerprints were recovered from the gun found in the Defendant's vehicle. He also agreed that no fingerprints were found on the comic books or their container.

The State rested and the Defendant advised the trial court that he planned to call two witnesses, Detective William White and Sergeant David Durham. The trial court ordered the

Defendant to question both witnesses outside the presence of the jury, as a "dry run," so the trial court could determine the relevance of the Defendant's questions. After the "dry run" examination of both witnesses, the jury was brought into the courtroom, and the Defendant declined to question either of the witnesses.

Outside the presence of the jury, the trial court noted for the record that the Defendant had yelled obscenities in the courtroom and acted in a disruptive manner and had to be escorted out of the courtroom. Officer Jeff Bills testified that he was a court officer for the trial judge. He stated that, when the Defendant was not in the courtroom, he was able to see and hear the proceedings through a live video stream. Officer Terry Lafary testified that he worked for Tennessee Department of Correction and had transported the Defendant to and from court throughout the trial. Officer Lafary stated that, one day during the trial, the Defendant was pepper sprayed because he refused to get dressed to come to court. He described the Defendant as belligerent and agitated.

Based upon this evidence, the jury convicted the Defendant of theft of property valued at over $60,000.

As to the felon in possession of a weapon charge, Elaine Ragan testified that she was the Criminal Court Clerk's Office division chief. Ms. Ragan identified a certified copy of the Defendant's prior conviction for a felony in case number 2004-B-1762, Theft of Property, a Class C Felony.

Based upon this evidence, the jury convicted the Defendant of being a felon in possession of weapon. At the sentencing hearing, the State offered the presentence report and certified copies of the Defendant's convictions. Those convictions showed that the Defendant had previously been convicted of: two counts of burglary, three counts of aggravated burglary, two counts of aggravated robbery, one count of felony possession of a weapon, one count of theft of property valued at over $10,000, one count of theft of property valued at over $1,000, and one count of aggravated assault. The Defendant had been released on bond at the time he committed the offenses herein.

The trial court sentenced the Defendant as a career offender to concurrent sentences of thirty years for his theft conviction and six years for his weapon possession conviction. The trial court noted that the Defendant's sentence was required to run consecutively to his sentence in another case. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it determined that he had forfeited his right to counsel; (2) the trial court erred when it denied his motion to suppress evidence seized from his vehicle; (3) the trial court erred when it determined that the State had not committed a *Brady* violation; (4) the evidence is insufficient to sustain his conviction for theft of property valued over $60,000; (5) the trial court erred when it admitted into evidence a business record and an out-of-court statement pursuant to hearsay exceptions; (6) the trial court erred when it declined to bifurcate the felon in possession of a weapon charge; and (7) the trial court erred when it limited the Defendant's ability to call witnesses to testify.

## A. Right to Counsel

The Defendant first contends that the trial court erred when it determined that he had forfeited his right to counsel. He contends that, though he was "difficult, sometimes uncooperative and had engaged in some misconduct," his behavior did not rise to the level of "extremely serious misconduct" justifying a forfeiture of counsel. The State responds that the Defendant's behavior was "abusive, delaying, and manipulative of the judicial process" and justified his forfeiture of his right to counsel due to his "extremely serious misconduct." We agree with the State.

"A trial court's determination after a hearing that a defendant has behaved in such a manner as to forfeit his constitutional right to legal counsel at trial is a mixed question of law and fact." *State v. Holmes*, 302 S.W.3d 831, 837-38 (Tenn. 2010) (citing *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 305 (Tenn. 2005)). "This Court reviews mixed questions of law and fact de novo, accompanied by a presumption that the trial court's findings of fact are correct. *Id.* (citations and footnote omitted).

The right to counsel is grounded in the constitution. It is a fundamental constitutional principle that a person is entitled to a fair trial. U.S. Const. amend. XIV, § 1 (providing that no State shall "deprive any person of life, liberty, or property, without due process of law"). To protect this right, a person who is accused of a crime is entitled to representation by counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). This right is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *Gideon v. Wainwright*, 372 U.S. 335, 342 (1963); *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006); *State v. Northington*, 667 S.W.2d 57, 60 (Tenn. 1984); see U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."); Tenn. Const. art. I, § 9 ("[I]n all criminal prosecutions, the accused hath the right to be heard by himself and his counsel.").

The United States Supreme Court has observed, however, that "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *State v. White*, 114 S.W.3d 469, 475-76 (Tenn. 2003) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988); *State v. Huskey*, 82 S.W.3d 297, 305 (Tenn. Crim. App. 2002)). Thus, under both the Sixth Amendment and article I, section 9, the right to the counsel of one's choosing "must be balanced against the requirements of the fair and proper administration of justice." *Id.* (citing *Huskey*, 82 S.W.3d at 305 and *United States v. Micke*, 859 F.2d 473, 480 (7th Cir. 1988)).

The issue of a criminal defendant's forfeiture of right to counsel is one that was addressed at length by our Supreme Court in *Holmes*, as well as in *State v. Carruthers*, 35 S.W.3d 516 (Tenn. 2000). In *Holmes*, our Supreme Court stated:

> Although the right to counsel at trial is fundamental, it is not without limits. A criminal defendant may be deemed to have forfeited this right when he or she engages in "extremely serious misconduct," *Carruthers*, 35 S.W.3d at 548 (citing *Goldberg*, 67 F.3d at 1102), or engages in an "egregious manipulation" of the right to counsel "so as to delay, disrupt, or prevent the orderly administration of justice." *Id.* at 550. Whether a defendant engages in some form of conduct that justifies a ruling of forfeiture may generally be determined only after an evidentiary hearing at which the defendant is present and permitted to testify. [FN6] *Means*, 907 N.E.2d at 662; *King v. Superior Court*, 107 Cal.App.4th 929, 132 Cal.Rptr.2d 585, 598–99 (2003). The State bears the burden of establishing that the defendant committed such actions as to justify a forfeiture. *See Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). Factors relevant to the trial court's consideration include (1) whether the defendant has had more than one appointed counsel; (2) the stage of the proceedings, with forfeiture "rarely . . . applied to deny a defendant representation during trial"; (3) violence or threats of violence against appointed counsel; and (4) measures short of forfeiture have been or will be unavailing. *Means*, 907 N.E.2d at 659-661.
>
> > [FN6] An exception to this general rule may obtain where the defendant engages in the conduct at issue in open court. *See, e.g., United States v. Leggett*, 162 F.3d 237, 250 (3rd Cir.1998).

*Holmes*, 302 S.W.3d at 841.

In *Carruthers*, a death penalty case, the defendant employed a "significant pattern of verbal threats and manipulation of the system resulting in the ultimate withdrawal of seven lawyers and deliberate delay of the judicial process, all occasioned by the defendant." *Id.* After reviewing the defendant's behavior and history of representation, our Supreme Court concluded that "an indigent criminal defendant may implicitly waive or forfeit the right to counsel by utilizing that right to manipulate, delay, or disrupt trial proceedings." *Carruthers*, 35 S.W.3d at 549. Our Supreme Court further concluded that the defendant's conduct "was sufficiently egregious to support a finding that he forfeited his right to counsel" in that the defendant "repeatedly and unreasonably demanded that his appointed counsel withdraw and that new counsel be appointed," made unreasonable demands, "outrageous allegations and threats," and overall employed tactics to delay his case from going to trial. *Id.* at 550. The Court commented: "in situations such as this one, a trial court has no other choice but to find that a defendant has forfeited the right to counsel; otherwise, an intelligent defendant 'could theoretically go through tens of court-appointed attorneys and delay his trial for years.'" *Id.* (citation omitted).

In *Holmes*, contrary to *Carruthers*, our Supreme Court found that the defendant's conduct did not justify forfeiture of representation. The facts are distinguishable from those in *Carruthers*, in that the issue of the defendant's forfeiture arose from "a single incident involving a single attorney but includ[ed] a physical assault and an ambiguous verbal threat." *Holmes*, 302 S.W.3d at 841. The defendant in *Holmes* "took no action to remove counsel from his case," and there was no indication that the defendant attempted to "delay or disrupt the proceedings," or "took any other actions aimed at manipulating the court or obstructing the orderly progression of his trial." *Id.* at 847. Because the Supreme Court in *Holmes* viewed the facts as markedly different from those in *Carruthers*, it reviewed case law from a variety of jurisdictions and concluded:

> [T]hese cases make clear that a criminal defendant's constitutional right to the assistance of counsel is so fundamental, particularly at trial, that only the most egregious misbehavior will support a forfeiture of that right without warning and an opportunity to conform his or her conduct to an appropriate standard. We agree with the Massachusetts Supreme Court that "[f]orfeiture is an extreme sanction in response to extreme conduct that imperils the integrity or safety of court proceedings," that it should be utilized only under "extraordinary circumstances," and that it should be a "last resort in response to the most grave and deliberate misconduct." *Means*, 907 N.E.2d at 658, 659, 660. We also agree with the United States Court of Appeals for the Second Circuit that a defendant should not be found to have forfeited (or implicitly waived) his right to counsel at trial on the basis of a single incident of physical violence unless the violence was extreme and (1) the defendant was previously

24

warned that he could lose the right to counsel for such behavior; (2) there is evidence that the defendant engaged in the violence in order to manipulate the court or delay the proceedings; or (3) it is not possible to take other measures that will protect the safety of counsel. *Gilchrist*, 260 F.3d at 89. (footnote omitted)

*Id.* at 846-47. In *Holmes*, the Court held that "the [d]efendant's behavior toward his lawyer [did] not justify the extreme sanction of total forfeiture of his right to counsel." *Id.* at 847-48. The Court emphasized the particularity of the facts of the case:

> (1) [d]efendant's behavior occurred prior to his trial such that a forfeiture affected his right to counsel at trial rather than at a later proceeding such as sentencing; (2) there is no indication in the record that [d]efendant attacked his lawyer in order to obstruct, delay, or manipulate the proceedings; (3) [d]efendant's attack did not result in bodily injury to his lawyer; (4) [d]efendant's assault was limited to a single incident committed against his first lawyer; and (5) other means of protecting the lawyer's safety were available.

*Id.* at 848. The Court noted, however, that whether an attack constituted "extremely serious behavior" sufficient to justify the forfeiture of counsel was a determination to be made based "upon the particular facts and circumstances of the attack at issue." *Id.* at 847. In a footnote to this statement, the Court advised:

> We do not imply by our decision in this case that a criminal defendant may not be found to have forfeited his right to counsel in the absence of a physical assault. A forfeiture (or an implicit waiver) may withstand constitutional scrutiny where, for instance, a defendant repeatedly threatens harm to his lawyer and/or his lawyer's family and it is apparent that the defendant has the ability to deliver on his threats.

*Id.* at 847.

In the present case, the trial court held a hearing on this issue and made specific findings of fact in its order holding that the Defendant had forfeited his right to counsel. The Defendant was represented by four different attorneys and refused to cooperate with any of them. He repeatedly asked the trial court to allow him to proceed *pro se* and filed motions without the aid of counsel. The Defendant was belligerent and verbally abusive to Mr. Walwyn's and to Mr. Byrd's staffs. He left messages on Mr. Byrd's voicemail, which were played for the trial court, threatening to assault Mr. Byrd in court. As indicated by the trial

25

court, the Defendant was difficult or hostile towards each of his four appointed counsel, and the Defendant even spit on Mr. Byrd in court. Mr. Walwyn and Mr. Byrd both advised the trial court that the Defendant was making it difficult, if not impossible, for them to represent him. On several occasions, the Defendant refused to come into the courtroom and refused to participate in the proceedings that he attended, turning his back to the trial judge during one proceeding. This evidence supports the trial court's finding that the Defendant was engaging in delay tactics to prevent the case from going to trial.

Even though the forfeiture of counsel occurred prior to trial, based on these facts, we conclude that the Defendant's behavior was "sufficiently egregious to support a finding that he forfeited his right to counsel" and in such a situation, the trial court had no other choice than to conclude that the Defendant had forfeited his right to counsel. *Carruthers*, 35 S.W.3d at 550. Due to numerous delays caused by the Defendant, this case was not tried until three years after the crime was committed. The Defendant was uncooperative or refused to participate in multiple proceedings, and he repeatedly demanded that he be appointed a new attorney or be allowed to represent himself. The Defendant's threatening and abusive behavior towards his attorneys and their staff seemed to escalate with each new appointment of counsel. Indeed, the Defendant spit on his fourth attorney and threatened to physically assault him on multiple occasions. In such a situation, the trial court would be hard-pressed to appoint a fifth attorney without serious concern for his or her safety.

Accordingly, we conclude that the Defendant's behavior warranted a forfeiture of the right to counsel. We pay close heed to the admonishment in *Carruthers* that "a finding of forfeiture is appropriate only where a defendant egregiously manipulates the constitutional right to counsel so as to delay, disrupt, or prevent the orderly administration of justice." 35 S.W.3d at 550. We conclude that, in this case, "the record demonstrates such egregious manipulation" and, thus, a finding of forfeiture was proper. *Id.* The Defendant is not entitled to relief as to this issue.

### B. Motion to Suppress

The Defendant next contends that the trial court erred when it denied his motion to suppress evidence seized from his vehicle. He contends that the warrantless seizure of his vehicle was improper and that the automobile exception does not allow for "indefinite seizure" without a warrant. He further contends that the fruits of the search are illegal because Detective Eubank, in seizing the Defendant's vehicle, "acted contrary to T.C.A. § 6-54-301." The State counters that the comic books that were in plain view of Detective Eubanks justified the seizure of the Defendant's vehicle. The State further argues that any violation to § 6-54-301 does not "implicate the Defendant's constitutional rights and does not require suppression."

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and "'article 1, section 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment.'" *State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting *Sneed v. State*, 221 Tenn. 6, 423 S.W.2d 857, 860 (1968)). The analysis of any warrantless search must begin with the proposition that such searches are per se unreasonable under the Fourth Amendment to the United States Constitution and article 1, section 7 of the Tennessee Constitution. This principle against warrantless searches is subject only to a few specifically established and well-delineated exceptions. *See Katz v. United States*, 389 U.S. 347, 357 (1967); *State v. Tyler*, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980). Evidence discovered as a result of a warrantless search or seizure is subject to suppression unless the State establishes that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

The plain view exception applies when a seized item is in "plain view" from a lawful vantage point of the officer that conducts the search. *See Harris v. United States*, 390 U.S. 234, 236 (1968); *see also State v. Jamie Lee Pittman*, No. 03C01-9701-CR-00013, 1998 WL 128801 (Tenn. Crim. App., at Knoxville, March 24, 1998), *no perm. app. filed*. The "plain view" doctrine requires proof that: (1) the objects seized were in plain view; (2) the viewer had a right to be in position for the view; and (3) the incriminating nature of the object was immediately apparent. *Horton v. California*, 496 U.S. 128, 136-141 (1990); *see also Pittman*, 1998 WL 128801, at *1.

27

In *Armour v. Totty*, our Supreme Court, in delineating the plain view doctrine, noted that the Fourth Amendment protects only "that which an individual seeks to 'preserve as private.'" 486 S.W.2d 537, 539 (Tenn. 1972) (quoting *Katz v. United States*, 389 U.S. 347 (1967)). The court said, "An individual does not seek to 'preserve as private' that which falls in the 'plain view' of an officer who has the right to be there. Visual detection of this nature does not constitute a search within the meaning of the Fourth Amendment." *Id.* This Court has previously held "admissible under the 'plain view' doctrine" a pistol lying in an automobile that was observed by an officer "inadvertently while at a place where he had a right to be." *State v. Yarbro*, 618 S.W.2d 521, 524 (Tenn. Crim. App. 1981). Indeed, "'[e]xtensive, and often noncriminal contact with automobiles will bring local officials in "plain view" of evidence, fruits, or instrumentalities of a crime, or contraband.'" *State v. Moats*, 403 S.W.3d 170, 182 (Tenn. 2013) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 442, (1973)).

"The 'automobile exception' to the warrant requirement permits an officer to search an automobile if the officer has probable cause to believe that the automobile contains contraband." *State v. Saine*, 297 S.W.3d 199, 207 (Tenn. 2009) (quoting *Carroll v. United States*, 267 U.S. 132, 149, (1925)). The automobile exception to the warrant requirement is founded upon the impracticality in obtaining a warrant to search an inherently mobile situs and upon the 'reduced expectation of privacy' in automobiles. *Saine*, 297 S.W.3d at 207. Consequently, "[i]f the officer has probable cause to believe that the automobile contains contraband, the officer may either seize the automobile and then obtain a warrant or search the automobile immediately." *Id.* (citing *Chambers v. Maroney*, 399 U.S. 42, 52 (1970). Neither the United States Constitution nor the Tennessee Constitution requires "a separate finding of exigency in addition to a finding of probable cause." *Id.*

In this case, the evidence presented showed that Detective Eubank obtained, from The Great Escape, the license plate number of vehicle driven by the men attempting to sell Dr. Clark's stolen comic books. Detective Eubank located a vehicle with the same license tag number and determined it was registered to the Defendant. The vehicle was parked in a condominium complex, which was open to the public during the day. Detective Eubank approached the vehicle, which was parked in a community parking space. The Defendant was not present, and Detective Eubank observed, through the glass window on the rear seat of the vehicle, a stack of comic books in a container. Suspecting that the comic books belonged to Dr. Clark, he called Dr. Clark on his cell phone to ask again for a description of the comic books and their packaging. Over the phone, Dr. Clark gave a description of the comic books, and his description matched "to a 'T'" the comic books that Detective Eubank could see in the backseat of the Defendant's vehicle. Dr. Clark described a black "S" written

on the packaging of the comic books and Detective Eubank observed this same marking on those inside the vehicle.  Based on his observations, Detective Eubank called his supervisor and a tow company, and the vehicle was towed to the police department's impound lot.  A search warrant was later obtained and a subsequent search of the vehicle occurred.

We conclude that: (1) the comic books were in plain view; (2) Officer Eubank had a right to be in the condominium complex and standing next to the Defendant's vehicle when he viewed the comic books; and (3) the incriminating nature of the comic books was immediately apparent.  *Horton*, 496 U.S. at 136-41.  Detective Eubank's observation of the comic books in plain view gave him probable cause to believe that the Defendant's vehicle contained stolen property, and thus, the seizure of the vehicle pursuant to the automobile exception was justified.  *Saine*, 297 S.W.3d at 207.

As to the Defendant's argument that, pursuant to Tennessee Code Annotated section 6-54-301, Detective Eubank was operating outside the parameters of his jurisdiction and his authority as a police officer, we agree with the trial court's conclusion that this statutory violation is not a violation of the Defendant's constitutional rights, rendering the exclusionary rule inapplicable.  *See State v. Carter*, 160 S.W.3d 526, 532 (Tenn. 2005) (citing *Wong Sun v. United States*, 371 U.S. 471, 487 (1963)).  The trial court did not err when it denied his motion to suppress.  The Defendant is not entitled to relief on this issue.

### C. *Brady* Violation

The Defendant next contends that the trial court erred when it failed to require the State to disclose exculpatory evidence favorable to the Defendant.  He contends that the "obviously exculpatory" evidence was the prosecutor's telephone conversation "with a man in New York who had written a check made out to [the Defendant] for some rare comic books that were ultimately recovered by Dr. Clark . . . .  In that conversation, [the prosecutor] asked the man, whose name [the prosecutor] could not recall, if he could identify the men who sold him the comic books and the man replied that he could not[.]"  The State responds that this evidence is "weakly exculpatory" and that it is not material.

In *Brady v. Maryland*, the United States Supreme Court held, "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963).  Evidence that is "favorable to an accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001).  Favorable evidence has also been defined as:

29

evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

*Johnson*, 38 S.W.3d at 56-57 (quoting *Commonwealth v. Ellison*, 376 Mass. 1, 379 N.E.2d 560, 571 (1978)).  The State has an obligation to disclose "any favorable evidence known to the others acting on the government's behalf in the case, including police."  *Johnson*, 38 S.W.3d at 56 (quoting *Strickler v. Green*, 527 U.S. 263, (1999)).  Additionally, "The duty to disclose exculpatory evidence extends to all 'favorable information' irrespective of whether the evidence is admissible at trial."  *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004) (citing *Johnson*, 38 S.W.3d at 56).

The State does not have an obligation to disclose information that is not in the possession or control of the State.  *Id.* (citing *Banks v. State*, 556 S.W.2d 88, 90 (1977)).  A defendant must prove the following four prerequisites in order to establish a violation of due process under *Brady*:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
2. The State must have suppressed the information;
3. The information must have been favorable to the accused; and
4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995).  The defendant must prove a due process violation by a preponderance of the evidence.  *Id.* (citing *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).

The Tennessee Supreme Court defined "material" within the context of *Brady*: Evidence is deemed to be material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  . . . [A] reviewing court must determine whether the defendant has shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict."  In other words, evidence is material when, because of its absence, the defendant failed to receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence."

*Johnson*, 38 S.W.3d at 58 (citations omitted).

In the motion for the new trial, the prosecutor testified about his conversation with the comic book dealer in New York. He stated:

> I knew that [the comic books] had obviously been recovered in New York because [Dr. Clark] bought them back from the man in New York. And in getting ready for trial I called [the man in New York] – I can't remember the man's name, but I had [his name] because [Dr. Clark] had it. . . . [I]t's my recollection that [the man in New York] said that two men had come up there with these comic books . . . . I asked him, do you think you would be able to identify either or both of these men. He said no. If he had said yes, I might have moved on with trying to get some photos sent up there. . . . But he said no.

> . . . .

> The fact that the man [in New York] who did the business with the people who had the comic books said I would not be able to make an identification at that point, I certainly didn't feel like that was exculpatory. That cut neither way. I mean, time had passed. The fact that somebody could not make an identification I didn't feel made it anymore [sic] or less likely that the [D]efendant was guilty. . . . . I didn't feel like that was exculpatory in any way. And I felt like what it showed was – what was ultimately introduced at trial [was the receipt of the sale to the man in New York] showed that somebody purporting to be [the Defendant] went up there [to New York] with comic books and did a deal for the comic books.

The Defendant contends that evidence of the prosecutor's conversation with the man in New York was "at the very least favorable" to the Defendant and "possibly exculpatory," in that "any doubt that could be cast about the identity of the person selling the comics" was critical to the Defendant's theory of defense.

We conclude that the Defendant has not established all four prerequisites in order to establish a violation of due process under *Brady*. Assuming that the Defendant or one of his attorneys had requested the information about the prosecutor's conversation, and the State suppressed that information, the remaining factors have not been established. We conclude that the Defendant has not established that this evidence was material, in that the State's withholding of this information did not put the entire case in a different light or undermine the confidence in the verdict. *See Johnson*, 38 S.W.3d at 58. The Defendant's identity was never in question, as other witnesses identified the Defendant as the seller of the stolen comic

31

books and his name was listed on sales documentation. The fact that the man in New York could not identify him is immaterial. The Defendant is not entitled to relief on this issue.

## D. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for theft of property valued at over $60,000. He contends that there was insufficient evidence of the value of the comic books because Dr. Clark's testimony about their value was biased and speculative because it was "his own personal opinion without any corroboration from an independent source" and because he did not testify about their condition and quality. The State responds that Dr. Clark's testimony about the value of each comic book and his explanation for "how he arrived at those values was more than sufficient to establish this element." The State contends that it was for the fact-finder to assess Dr. Clark's credibility and that this Court should not re-weigh the evidence in place of the jury. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by

the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a) (2014). Theft of property valued over $60,000 but less than $250,000 is a Class B felony. T.C.A. § 39-14-105(5) (2014). The value of the property taken is an element of the offense of theft. *Id.*; *see also State v. Mike Wayne Tate*, No. 03C01-9204-CR-127, 1993 WL 55631, at *2 (Tenn. Crim. App., at Knoxville, March 4, 1993), *perm. app. denied* (Tenn. June 1, 1993). Tennessee Code Annotated section 39-11-106(a)(36)(A) defines "value" as "(i) The fair market value of the property or service at the time and place of the offense; or (ii) If the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense." The fair market value of property is a question of fact for the jury. *See State v. Hamm*, 611 S.W.2d 826, 828-29 (Tenn. 1981).

The record shows that the jury was properly instructed on how to assess the value of the stolen property - that the value of the stolen comic books was the fair market value at the time of the offense. Dr. Clark testified that he determined the fair market value of the comic books by using his experience and knowledge as a comic book collector, based particularly on his monthly involvement in the online comic book market. He also utilized online pricing

guides and research. Additionally, Dr. Clark repurchased the stolen comic books from some of the dealers and collectors, and he used the purchase price in those transactions to help determine their value. The Great Escape also provided him a valuation for the comic books that were in its possession. Using these tools and his knowledge, Dr. Clark determined that the value of the stolen comic books was $83,130. There was an opportunity for cross-examination of Dr. Clark regarding his determination of the value. The jury heard Dr. Clark's testimony concerning his methodology for ascertaining value and determined that the fair market value was more than $60,000. We conclude that the evidence presented to the jury was sufficient to support determination, beyond a reasonable doubt, that the value of the property exceeded $60,000. The Defendant is not entitled to relief on this issue.

### E. Hearsay
### 1. Affidavit

The Defendant contends that the trial court erred when it admitted into evidence the affidavit from Tamara Cain, an accountant at Metropolis. The affidavit, he contends, was admitted into the record in error because it was hearsay and its creator was not present to testify to its authenticity. He contends that, standing alone, the affidavit "provides scant evidence at best as to what it purports to be and how it is in any way connected to [Metropolis], or the sale of Dr. Clark's comic books . . . ." He contends that the trial court did not assess the document for its trustworthiness and should have inquired about the same, considering the Defendant's *pro se* status. The Defendant also contends that the receipt, which listed his name, was prejudicial because it allowed the jury to infer that the Defendant sold the comic books to Metropolis, despite no other evidence of the same. The State responds that the affidavit was properly admitted pursuant to Tennessee Rules of Evidence 803(6) and 902(11).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible unless admission is authorized by the evidence rules or by other controlling provisions of law. *Id.* at 802. Tennessee Rules of Evidence 803 and 804 list the exceptions to this general rule of inadmissibility. One such exception is for business records. Tenn. R. Evid. 803(6). It provides as follows:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the

34

testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

Tenn. R. Evid. 803(6). The foregoing exception "rests on the premise that records regularly kept in the normal course of business are inherently trustworthy and reliable." *Alexander v. Inman*, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995), *perm. app. denied* (Tenn. July 3, 1995). Tennessee Rule of Evidence 902(11) eliminates the need to call the custodian of records as a trial witness. Tenn. Rule. Evid. 803(6), *Advisory Comm'n Comts*. Rule 902(11) provides:

> The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by an affidavit of its custodian or other qualified person certifying that the record-
>
> (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of and a business duty to record or transmit those matters;
> (B) was kept in the course of the regularly conducted activity; and
> (C) was made by the regularly conducted activity as a regular practice.
>
> A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

Tenn. R. Evid. 902(11). The appropriate standard of review was recently amended by our supreme court and is as follows:

> The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in

35

the record preponderates against them. *State v. Gilley*, 297 S.W.3d at 759-61. Once the trial court has made its factual findings, the next questions -- whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule -- are questions of law subject to de novo review. *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement. However, the statement may otherwise run afoul of another rule of evidence. *State v. Gilley*, 297 S.W.3d at 760-61. For example, a trial court may decline to admit an excited utterance if it finds the utterance lacks relevance under Tenn. R. Evid. 401 & 402 or if it finds the utterance's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. If a trial court excludes otherwise admissible hearsay on the basis of Rule 401, 402, or 403, this determination is reviewed for abuse of discretion. *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992); *State v. Gilley*, 297 S.W.3d at 759-61; *see also* 1 McCormick § 185, at 1010.

*Kendrick v. State*, 454 S.W.3d 450, 479-80 (Tenn. 2015).

Dr. Clark testified that he was notified by Metropolis that they had purchased some of his stolen comic books and that he repurchased the stolen comic books from Metropolis for $5,000. The State sought to introduce a receipt of this purchase and read into the record an affidavit from Tamara Cain who stated that she was an accountant at Metropolis and held that position on the date of Dr. Clark's purchase. She further stated:

My responsibilities include all matters of a financial nature including the maintenance and storage of the business records for [Metropolis].
1. The attached [receipt] was made at or near the time of the activity indicated within the record by an employee of . . . [Metropolis].
2. The employee had the business duty to record this information and did so.
3. This record and others like it are generated as part of the regularly conducted activities of our business, and it is our practice to generate such records.

36

4. This record was retrieved from our records at the request of [the Davidson County District Attorney].

The affidavit was signed by Ms. Cain. Attached to the affidavit was the receipt, dated June 11, 2010. The receipt showed that $5,000 cash was paid to "Timothy Carter" for "comics purchases." Metropolis was not listed on the receipt.

The Defendant argues that the receipt was hearsay and was not properly examined for its trustworthiness or authenticity and that the trial court should have made further inquiry. While we agree that the receipt does not identify Metropolis on its face, Ms. Cain, in a sworn affidavit, testified that it was a business record generated by a Metropolis employee to record the purchase of comic books. Ms. Cain testified that the record was kept in the course of a regularly conducted business activity. This is sufficient to show that the receipt was a business record, inherent of trustworthiness. *See Alexander*, 903 S.W.2d at 700. The Defendant made no objection to its trustworthiness or any other aspect of the document. As such, we conclude that the receipt was properly admitted under the business records exception pursuant to Rule 803(6) and that Ms. Cain's sworn affidavit complied with Rule 902(11).

The Defendant makes a secondary argument that he was prejudiced by admittance of the receipt because his name was listed on the document. Evidence must be relevant to an issue that the jury must decide before it may be admitted. *State v. Jordan*, 325 S.W.1, 84 (Tenn. 2010) (citing Tenn. R. Evid. 401, 402). Evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. *Id.* Additionally, the probative value of the evidence, in this case the receipt, must outweigh any unfair prejudicial effect that it may have upon the trier of fact. *Id.*; *see also* Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]")

Dr. Clark testified that he bought back his stolen comic books from Metropolis in New York City. From this testimony, and in light of the other evidence implicating the Defendant, the jury could infer that it was the Defendant who sold the comic books to Metropolis after he stole them from Dr. Clark. That the Defendant's name was on the Metropolis receipt merely made this inference more probable. The receipt was not more prejudicial than probative simply because the Defendant's name was on it. The Defendant is not entitled to relief on this issue.

## 2. Mr. Carpenter's Recorded Statement

37

The Defendant next contends that the trial court erred when it admitted Mr. Carpenter's out of court statement, pursuant to Tennessee Rule of Evidence 803(26), made during a recorded phone call with Detective Eubank, wherein Mr. Carpenter says that the comic books were procured by "hitting a lick." He contends that Mr. Carpenter had already testified about what was contained in the recorded statement, and thus its admission was redundant and unnecessary. The State responds that Mr. Carpenter originally testified inconsistently about his statement, but concedes that Mr. Carpenter later acknowledged making the statement. The State contends, however, that any error regarding the admission of this statement is harmless.

Tennessee Rule of Evidence 803(26) provides a hearsay exception for a testifying witness's prior inconsistent statement when the statement would be "otherwise admissible under [Tennessee Rule of Evidence] 613(b)" and satisfies the following conditions:

> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.
> (B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.
> (C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26). Rule 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Rule 613 also makes clear that "prior inconsistent statements, and not consistent statements, are within the ambit of this rule." The standard of review regarding a trial court's decision to admit or exclude a hearsay statement such as a prior inconsistent statement is *de novo*. *See Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015) (stating that a trial court's decision of whether a statement is hearsay and whether the statement can be admitted into evidence pursuant to a hearsay exception is subject to *de novo* review).

Mr. Carpenter initially testified at trial that he had told Detective Eubank that the Defendant had gotten the comic books from a "guy that wanted crack" in exchange for the comic books. When questioned about his statement to Detective Eubank, Mr. Carpenter denied telling Detective Eubank that the Defendant had gotten the comic books from "hitting a lick." During a hearing held outside the presence of the jury, the recording of Mr. Carpenter's phone conversation with Detective Eubank was played aloud. Mr. Carpenter then resumed testifying, and agreed that the recording had reminded him of his statement to

38

Detective Eubank. In the presence of the jury, Mr. Carpenter admitted that the Defendant had told Mr. Carpenter that he got the comic books after the Defendant "hit a lick." The State then sought to introduce the recorded statement and the trial court determined that the recorded statement was admissible pursuant to Rule 613. The recording of Mr. Carpenter's and Detective Eubank's conversation was then played for the jury.

We agree with the Defendant that the introduction of Mr. Carpenter's recorded statement was error, in light of the fact that Mr. Carpenter, after hearing the recording, corrected his testimony and admitted that he had indicated to Detective Eubank that the Defendant procured the comic books after "hitting a lick." At that point, his prior statement no longer became inconsistent with his testimony and was not properly admitted pursuant to that hearsay exception. Therefore, the trial court erred when it allowed the statement to be admitted into evidence and played for the jury.

We must now determine the nature of the trial court's error. The Defendant argues that the evidence was prejudicial because the jury could reference the recording during deliberations without an explanation regarding the phrase "hit a lick." The State responds that any error in admitting Mr. Carpenter's statement was harmless because there was ample evidence connecting the Defendant to the burglary of Dr. Clark's home and that the admission of the recorded statement did not affect the outcome of the trial.

For the purposes of harmless error analysis, Tennessee recognizes three categories of error:

> 1) [S]tructural constitutional errors, which compromise the integrity of the judicial process and require automatic reversal; 2) nonstructural constitutional errors, which require reversal unless the State proves beyond a reasonable doubt that the error is harmless; and 3) non-constitutional errors, which do not require reversal absent proof by the defendant that the error more probably than not affected the judgment or would result in prejudice to the judicial process.

*State v. Brown*, 311 S.W.3d 422, 434 (Tenn. 2010) (citing *State v. Rodriguez*, 254 S.W.3d 361, 371-72 (Tenn. 2008)). The current case falls under the third category.

"A violation of an evidentiary rule may not mandate reversal if the error 'was more probably than not harmless.'" *State v. Martin*, 964 S.W.2d 564, 568 (Tenn. 1998) (citing *United States v. Barrett*, 703 F.2d 1076, 1081-82 (9th Cir.1983)). Under Tennessee Rule of Criminal Procedure 52(a), "[n]o judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on its merits."

Furthermore, "[t]he greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." *State v. Rodriguez*, 254 S.W.3d at 372. Also, "[t]he improper admission of evidence that is merely cumulative on matters shown by other admissible evidence may be harmless error." *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 388 (Tenn. Ct. App. 2006) (citing *McClure v. Mexia Indep. Sch. Dist.*, 750 F.2d 396, 402 (5th Cir.1985)).

We agree with the State that the erroneous introduction of Mr. Carpenter's statement was harmless. The State's evidence against the Defendant in this case was strong. The stolen comic books were found in the Defendant's vehicle, which was parked a short drive from Dr. Clark's house. Several witnesses testified that the Defendant or a "Timothy Clark" attempted to sell or sold the stolen comic books. Detective Eubank testified about his phone conversation with Mr. Carpenter and stated that Mr. Carpenter told him that the Defendant had gotten the comic books from "hitting a lick." The introduction of the recorded phone conversation between Detective Eubank and Mr. Carpenter did not add any new information to the case. The recorded conversation merely confirmed that which Detective Eubank and Mr. Carpenter had testified to. We conclude that the erroneous admission of Mr. Carpenter's statement to police was harmless because the error did not affirmatively affect the outcome of the trial and because the evidence contained in the statement was cumulative in nature. The Defendant is not entitled to relief on this issue.

### F. Bifurcation

The Defendant next contends that the trial court erred when it declined to bifurcate his felon in possession of a weapon charge. He contends that that the jury should have first been asked to consider whether he was in possession of a weapon and, after making that determination, the State should have presented any evidence as to a prior felony conviction. The State responds that there is no authority dictating that the jury should have returned a "partial verdict" on this charge.

We respectfully disagree with the Defendant's contention that this charge should have been bifurcated. In the case of a charge such as felon in possession of a weapon, it is clear that "specific reference[s] to [a] defendant's prior felonies" are "relevant to establish an essential element of the crime for which the defendant is being tried." *State v. James*, 81 S.W.3d 751, 760-61 (Tenn. 2002). The State was required to prove that the Defendant was a prior convicted felon and the jury, in order to convict of this charge, was required to determine that the Defendant was a prior convicted felon when he possessed the weapon. We know of no authority, and the Defendant points us to none, that requires the jury to first hear proof of one element of this charge, that the Defendant possessed a weapon, before

hearing proof that he was a prior convicted felon. The Defendant is not entitled to relief on this issue.

### G. Witnesses

The Defendant lastly contends that the trial court erred when it restricted the Defendant's ability to call certain witnesses to testify. He also contends that the trial court "improperly handled" the witnesses that the Defendant intended to call. The State counters that the trial court properly determined that certain witnesses the Defendant intended to call had no knowledge of the case and thus could provide no relevant testimony. The State further contends that the trial court properly restricted the Defendant from questioning other witnesses about "prejudicial and irrelevant matters."

Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence. *State v. Flood*, 219 S.W.3d 307, 316-17 (Tenn. 2007). Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony. *See Chambers v. Mississippi*, 410 U.S. 284 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000). In *Washington v. Texas*, 388 U.S. 14 (1967), the United States Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. at 19.

The right to offer testimony, however, is not absolute: "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence . . . ." *Chambers*, 410 U.S. at 302. Rules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process. *Id.* So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense. *Flood*, 219 S.W.3d at 317 (citations omitted). Because "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," *Scheffer*, 523 U.S. at 308, "[a]n evidentiary ruling ordinarily does not

rise to the level of a constitutional violation." *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2006).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Pursuant to Rule 401, evidence is deemed relevant if it has "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *See State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995) (quoting Tenn. R. Evid. 401). In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4][a] (6th ed. 2011).

We first turn to decide whether the testimony of the proffered witnesses excused by the trial court were relevant. The trial court excused witnesses, Christine Reeves, Sergeant Rutzky, and Lieutenant Howey, based on their testimony that they had no knowledge of the case and had not been involved in its investigation or any other aspect of the case. We conclude that the trial court did not abuse its discretion when it determined that these witnesses were not relevant based upon their testimony that they had no knowledge of the crimes for which the Defendant was being tried.

As to the Defendant's contention that the trial court mishandled the Defendant's witnesses that did testify, at several points during his questioning, the Defendant commented that he did not know what to ask the witnesses because he did not have an attorney, or he attempted to ask questions about his car being seized. We similarly conclude that the trial court did not abuse its discretion when it limited the Defendant to questions relevant only to the facts of the case and the investigation. The trial court correctly prohibited him from asking questions or commenting about issues about his right to counsel, suppression, or other issues already resolved by the trial court. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

42